[Civ. No. 6099. Third Appellate District.—June 23, 1938.]

In the Matter of the Estate of LAURA ANTOINETTE GRAFMILLER, Deceased. ALBERT E. STEARNS et al., Appellants, v. TYRE H. WATERLAND, as Executor, etc., Respondent.

Johnson & Curtright and Evan J. Hughes for Appellants.

Busick & Busick for Respondent.

PLUMMER, J.—Two appeals are presented in this cause upon one transcript with separate briefs. Both causes of appeal, however, will be considered in one opinion. One appeal is by Albert E. Stearns, from the order failing to appoint him as alternate executor of the estate of Laura Antoinette Grafmiller, deceased. The other appeal is by Annie Gertrude Van Tine, from an order of the probate court refusing to revoke the letters testamentary theretofore issued to the respondent Tyre H. Waterland.

The record shows that on or about the 30th day of April, 1935, Laura Antoinette Grafmiller made and executed her last will and testament, disposing of all of her property, and naming the respondent executor thereof. Later on, by a codicil added thereto, Albert E. Stearns, the appellant, was named as an alternate executor in said last will and testament, to be appointed and act in the event that the respondent, Waterland, could not, or would not serve as such executor.

Laura Antoinette Grafmiller died on the 24th day of March, 1937, leaving an estate in the county of Sacramento, and in the county of Alameda, variously estimated as of

the value of about $20,000. On the 12th day of April, 1937, respondent Waterland was appointed the executor of said last will, and letters testamentary were issued to him. He thereafter duly qualified as such executor and entered upon the duties as such executor. Thereafter, and on or about the 28th day of April, 1937, the respondent Waterland, by an instrument in writing, resigned his office as such executor. The instrument in writing is in the following words and figures, to wit:

"I, the undersigned, heretofore appointed as executor of the estate of the last will and testament of the above named testatrix, do hereby decline to further act as such executor, and respectfully request that an order of this court be made accepting my resignation. Dated, this 28th day of April, 1937.

"(Signed:) TYRE H. WATERLAND."

(We have omitted the title of court and cause.) This instrument in writing was filed with the clerk of the court.

On the 4th day of May, 1937, and at the request of Tyre H. Waterland, Albert E. Stearns filed a petition for his appointment as executor of the last will and testament of said deceased. On the 11th day of May, 1937, a substitution of attorneys took place. On the 10th day of May, 1937, respondent Tyre H. Waterland gave notice of the withdrawal of his resignation as executor, to the superior court and to the Honorable Peter J. Shields, as judge thereof; also, to Albert E. Stearns as his attorney.

The draftsman of the written resignation of Waterland just set forth herein appears to have been laboring under the impression that the common-law rule prevailed in this state, and that the acceptance of the resignation of Waterland was necessary that it might become effective. This, however, while once apparently the rule prevailing in this state, is no longer the law. Both the Political Code and the Probate Code provisions provide for an officer submitting a written resignation. Section 996 of the Political Code specifies when an office becomes vacant, only one of which we need mention as involved herein, to wit: Upon the written resignation of the incumbent.

Section 520 of the Probate Code, in so far as it is involved herein, reads: "An executor-administrator may resign his appointment at any time by writing filed in the Superior

Court, to take effect upon the settlement of his accounts.''
The executor or administrator is given just one right by
this provision of the Probate Code,—he may resign his
office by a written instrument to that effect. The time of
his being relieved from responsibility is simply dependent
upon his filing an account of his administration. The probate
court or the judge thereof is not required to either formally
or otherwise accept the resignation. The very moment a
resignation in writing is filed, it becomes an established fact,
and is not subject either to withdrawal, or dependent upon
an acceptance by the probate court, or any judge thereof.

The probate court is by the same section given certain
powers. If the resigning executor fails to promptly render
an account, the section provides that the probate court may
take certain action. Where it appears that the rights of
third parties are involved, the word ''may'', here, must be
construed as mandatory. (*Los Angeles County* v. *State of
California,* 64 Cal. App. 290 [222 Pac. 153]; *Stockton
Plumbing etc. Co.* v. *Wheeler,* 68 Cal. App. 592 [229 Pac.
1020].)

A somewhat similar question was before this court in
the case of *Meeker* v. *Reed,* 70 Cal. App. 119 [232 Pac. 760],
in which the resignation of certain councilmen of the city
of Santa Rosa was involved, and the question of acceptance
of resignations was considered and passed upon. This court
there said: ''The argument of counsel takes up *in extenso*
the question of officers *de jure* and *de facto,* which, however,
for reasons hereinafter stated, we think unnecessary to con-
sider. While other jurisdictions have held to a different
rule, it appears to be the settled law of this state that a
resignation takes effect immediately upon the date mentioned
in the written resignation, filed as provided by law by the
officer tendering his resignation. No acceptance is required.
It is also the settled law of this state that if an officer, after
tendering his resignation, continues to discharge the duties
thereof, he does so as a *de facto* officer, and is not a mere
usurper. The ruling is founded upon public necessity and
to prevent an hiatus in government.''

In *People* v. *Marsh,* 30 Cal. App. 424 [159 Pac. 191], the
effect of a written resignation and an attempted withdrawal
thereof was considered. It was there held that the written
resignation *ipso facto* terminated the officer's official position,

and no withdrawal thereof could be had, as no acceptance by another officer was necessary. It may be here stated that both in the Reed case and the Marsh case, hearings were denied by the Supreme Court.

In the Marsh case a district attorney by the name of D. V. Mahoney tendered his written resignation as district attorney of the county of San Diego. This resignation was in writing, and filed as prescribed by section 995 of the Political Code. Before his successor had been appointed Mahoney attempted to withdraw his resignation by serving notices upon the board of supervisors, stating his withdrawal, just as appears to have been attempted in this case by the serving of a notice of withdrawal. It was there held that under the provisions of section 995 of the Political Code, which provided for the filing of a written resignation, and not providing for any method of withdrawing the same, and there being nothing in the code provisions requiring an acceptance by the appointing power, the mere fact that the appointment of Marsh was made after the attempted withdrawal of his resignation by Mahoney did not affect the validity of the appointment of Marsh as district attorney of San Diego County.

In the case at bar section 520 of the Probate Code does not provide any method of withdrawing a written resignation, nor does that section of the code anywhere specify that the probate court must accept the resignation. As we have said, the probate court has simply the remaining power, the rendering a settlement of account. The section does not give the probate court, or judge thereof, any power either to accept or reject such written resignation. The fact that the written resignation of the respondent asked for the acceptance of his written resignation is only just so much surplusage.

In the case of *People* v. *Marsh, supra,* the opinion of which goes into the subject very extensively, it is held that the common-law rule requiring acceptance by the appointing power, when a written resignation is presented, is no longer the law in this state; that the code provisions specifying the act to be taken by the resigning officer, and not mentioning any acceptance as necessary by the appointing power, have eliminated the necessity of an acceptance, and the resignation takes effect without any such acceptance. The argument of the respondent that the acceptance of Waterland's

resignation must have been made by the probate court before a successor could be appointed, even where acceptance was necessary, appears to be negatived in the case of *Barboza* v. *Pacific Portland Cement Co.,* 162 Cal. 36 [120 Pac. 767].

We find by an examination of the authorities that in states where the code provisions are similar to ours, acceptance is unnecessary. (*State* v. *Fitts,* 49 Ala. 402; *Pace* v. *People,* 50 Ill. 432; *Gates* v. *Delaware County,* 12 Iowa, 405; *State* v. *Lincoln,* 4 Neb. 260; *State* v. *Clark,* 3 Nev. 566; *People* v. *Board of Metropolitan Police,* 26 N. Y. 316; *Reiter* v. *State,* 51 Ohio St. 74 [36 N. E. 943, 23 L. R. A. 681]; *State* v. *Breckinridge,* 34 Okl. 649 [126 Pac. 806].)

█ The respondent raises the point that no appeal lies in these cases. However, section 1240 of the Probate Code, and especially the last clause thereof, is a complete answer to the respondent's objection that an appeal does not lie.

Under the foregoing conditions, as shown by the record presented to the probate court, we think the court had but one duty to perform, and that was to require Waterland to account, and appoint his successor.

█ While section 996 of the Political Code may be held to refer specially to public officers, yet by parity of reasoning there seems to us to be no reason why the same rule of construction applied in section 996, *supra,* should not be held to govern our conclusions in interpreting section 520 of the Probate Code. Both sections are in derogation of the common law, and confer a right or privilege upon the person tendering his resignation which did not exist under the common law, to wit: a right to resign without acceptance. As defined in 11 California Jurisprudence, page 214, executors and administrators, while not public officers in the sense that they are charged with sovereign powers, the code provisions relating to bonds of officers, do apply to administrators and executors. To be sure, they are officers of the court, and the court is really the custodian of the estates of deceased persons, and the administrators or executors may be said to be mere stakeholders. Executors and administrators, while acting of course, are under the control and direction of the court. But that does not in anywise limit the provisions of section 520 of the Probate Code. Executors and administrators are not mere employees; they are distinctly officers without being invested with sovereign powers. As

we read the cases, under the law as it existed prior to the enactment of section 520 of the Probate Code, executors and administrators were denied the right to resign or relinquish their positions without first having received permission of the appointing power. It seems that the same rule prevailed as to public officers until the enactment of section 996 of the Political Code. Therefore, it would seem reasonable to conclude that the legislature intended the same construction to be given to one section of the code as to the other, relative to the effect of a written resignation.

The appellants in this case further urge that the respondent should be estopped from questioning the right of Stearns to be appointed executor of the last-will and testament of Laura Antoinette Grafmiller. Having stood by and encouraged the appellant Stearns to make application for such appointment, it is urged that equitable principles should be applied, and the respondent denied the privilege of changing his position adversely to the interests of the appellant. The following cases lend support to the appellants' position: *Bunting* v. *Willis*, 68 Va. 144 [27 Gratt. 144, 21 Am. Rep. 338]; *State* v. *Fitts, supra; State* v. *Murphy*, 30 Nev. 409 [97 Pac. 391, 18 L. R. A. (N. S.) 1210]; *In re Robinson Estate*, 65 Cal. App. 588 [224 Pac. 765], in which Presiding Justice Conrey, quoting from an opinion of Judge Coffey of the Superior Court of San Francisco, used language which aids appellants' contention that irrespective of what we have heretofore said, the respondent Waterland should not be allowed to change his position or withdraw his resignation to the injury of Stearns whom he had voluntarily led to file a petition for appointment, and that the respondent should be estopped against interposing any objection to the appointment of Stearns.

The petition of Annie Gertrude Van Tine for the revocation of the appointment of Waterland is based upon not simply the allegations of fraudulent conduct on the part of Waterland, but also upon his apparent attempt to convert to his own use and ownership several thousand dollars of the moneys left by said deceased, where his alleged ownership thereto is decidedly questionable. The petition and the testimony hereinafter set forth shows not simply the animosity of the respondent Waterland, but his apparent attempt to deprive the heirs and devisees named in the last

will and testament of Laura Antoinette Grafmiller, deceased, of any portion of the estate.

It seems to us unnecessary to cite authorities when an executor takes the position as shown by the testimony in this case that his appointment should be promptly revoked. An executor-administrator occupies a position of trust and confidence, and when he claims the estate, as shown by the record, upon a mere technicality, adversely to the heirs and devisees of the deceased, no argument is required to show that he can neither act fairly nor honestly. His testimony, as well as the testimony which we have set forth herein, shows evasion, indirection and concealment, any one of which is a badge of fraud. During the course of his examination he admits the ownership of the money by the deceased, and yet claims ownership in himself, from the mere fact that the account of the deceased was placed in the bank in a certain manner so that he might be able to pay the bills of the deceased. The record shows that for a number of months prior to her death, Laura Antoinette Grafmiller was unable to go to town, and was unable to transact any business. We may also add, the record shows that she signed her name by a mark. Under such conditions she had her accounts in the bank arranged in such manner that Waterland might pay the bills as they came in. The testimony showing the incompetency of Waterland is quite lengthy, but we set it forth in full. We may here state that objection was made to the testimony of one of the attorneys, on the theory that it was confidential, but as a third person was shown to be present, the objection appears to us to be without merit. The testimony relied upon, and which we think demanded the revocation of the Letters Testamentary theretofore given to respondent Waterland, is as follows:

"A. Yes, this is the—it is my writing right there. 'No cash belonging to the estate excepting that collected from tenants of property'. That's my writing. Q. Were there any other bank deposits that you know of? A. None whatever except what I had. I know that is Laura's, but I didn't have anything whatever to do with it. Q. Do you intend to claim that money that Mrs. Grafmiller had in the Capital National Bank? A. Well, that's the future; I can't talk about that. Q. What are your intentions? Do you intend to claim that? When you said on this statement you

gave to Mr. Johnson, 'No cash belonging to the estate except rents collected,' it was your intention to keep that money? A. That money was put in a sack and now it is in the Bank of America. Q. Mrs. Grafmiller was in poor health for some years before she died, was she not? A. What? Q. Mrs. Grafmiller was in poor health for a number of years before she died, was she not? A. About two years. Q. And how long was it that she couldn't get down town at all? A. Well, about two years and a half I went down with her. That was the first time she fell down. She fell down twice. Q. And didn't she tell you that was the reason for that account, so that you could draw the money out and pay bills? A. Well, I didn't write it. She had somebody write it, the two books. Q. I see. You had nothing whatever to do with it? A. Nothing whatever. Except it was given to me. I didn't ask for it. Q. When was it given to you? A. Well, I could give it to you exact here. The first was August 30, 1933. Q. That was the first deposit shown in the book? A. That was the first one that was put in the book for me. Q. For you? A. To take care of. Q. What? A. For me to take care of. Collections and like. After that I was doing all of the depositing and withdrawing, and so forth. Collections. On September the sixth, 1933. Q. And you had nothing to do with putting it in that form? A. Well, I was handling her money all the time, so I must have—sure, I had— Q. You always considered it her money? A. Sure, yes, sir, I did. The bank book will show it there. Yes, he (Mr. Van Tine) came over and asked questions, how much money did she have, and so forth. Q. And what did you tell him? A. I laughed. Q. Did you tell him there was going to be litigation? A. Litigation means nothing today. Q. Well, did you tell Mrs. de Poister on that occasion at your house that the reason for resigning was that Mrs. Van Tine was calling you a thief for keeping the $7,000.00? A. No, I knew too much to tell her on that. You can mark it down. Q. Well, what did she say? A. Well, you guys cut that out. I don't know about it. Why not cut it out? Q. Well, what was said about your resigning as executor? A. Well, you will have to ask those that talked about it. Wait a minute, just a second. When you are handling over $3,000.00 a year for a sick woman that was absolutely helpless —it run over $3,000.00 a year—paying it out. She had a

doctor come there three times a week, a chiropractor. Her sister objected to it, but it was none of my business. She got it from me. Q. I am referring now to what you said to Mr. Johnson about there being money in the estate or no money in the estate? A. I didn't say either way. Q. Just what you wrote on this paper? A. Why certainly. I would be very foolish to say there wasn't any money in there because the bank book shows it. Q. Well, just how did you happen to write this here that you say is in your own handwriting after giving a list of the real property, no cash belonging to the estate? Mr. Busick: He had no cash he said. That's what he said. A. No cash belonging to the estate excepting that collected from tenants of property.

"(Testimony of Mrs. Rudy de Poister, deceased's niece):

"A. I said: 'I am up here as a friend and not an enemy', and I didn't understand the wording of the property and I wanted him to tell me about it, and so we got to talking and he said that Mrs. Van Tine wasn't—wasn't going to get a cent if he could prevent it. He is very bitter toward her. (The Court): How is Mrs. Van Tine related to Mrs. Grafmiller? A. Sisters. Q. What? A. Sisters. (Mr. Hughes): She is named as a residuary legatee. A. And he also said he had deeds to every piece of property and he wouldn't give anybody anything unless he wanted to. Q. Did he say anything about having resigned? A. He said he had resigned. Q. Did he state any reason for it? What did he say? Just tell the court what he said? A. Well, he said that Mrs. Van Tine had called him a thief on account of the $7,000.00 that was in the bank, and he was honest and he wouldn't stand that from anybody, and he was regusted —disgusted, rather, and he was going to get out. In fact, he had resigned, he said.

"(Testimony of P. H. Johnson, attorney):

"A. I wanted to see if Mr. Roifsen would be out there, the witness, the other witness to the will, was here, and I went around to his seat and asked him if the witness was here, and he said he was, and then he (Waterland), immediately said to me, 'There is going to be a bombshell in this case', and, of course, I didn't know what he meant, and I asked him what he meant by a bombshell, and he said, 'I meant just exactly what I said; there is going to be a bombshell

in the case.' 'Well', I said, 'who is going to explode it?' 'Well, you will find out quick enough.'

"A. The first thing was the purpose for which he went to the office, was to sign the Letters Testamentary that had been granted, and prepare them for filing, and that was done, and then Mr. Waterland said again that there was going to be a bombshell in this matter, and I asked him what he meant by a bombshell, and he said: 'Well,' he said, 'old Miss Van Tine and George Van Tine thought they were—and the lawyers—that there was a whole lot of money in this estate, but that they were going to be badly fooled, because there wasn't any'. And then he pointed his finger at me and said, 'You are going to get stuck, too,' and at that point I proceeded to tell the gentleman, 'Never say that to me again,' and I told him very firmly—I didn't abuse him, but I told him never to make that statement to me in the office again, and then he commenced to talk about other things, and I said, 'The thing, now, that we want is an inventory of this estate,' and he talked about a couple of little lots up in North Sacramento, that the heirs could have them, they weren't worth anything, he didn't care, and laughed about it. He said there was a little property down at the Bay somewhere they could have if they wanted, he didn't care, and so forth, and I said, 'Well, now, what I want, Mr. Waterland, is an entire list of all the property that Mrs. Grafmiller possessed at the time of her death, in order that I may prepare and submit to the court, and also for appraisal, an inventory of the property of the estate.' He didn't make any reply to that, went on talking about other things, and I came back to it several different times, what I had to have; he was the only man that could give it to me, because if I didn't have the data I couldn't prepare the inventory. Then he pulled out of his inside pocket a little statement, this statement that is introduced in evidence, and he talked about this— And then I said to him, 'Is there any cash in this estate, Mr. Waterland?' And he said, 'Absolutely not', and I said, 'No cash at all?' 'No, there is no cash'. 'Well', I said, 'then, Mr. Waterland, you better write that on the statement', and he did so—that is his handwriting there— and then I looked at him and I said, 'Mr. Waterland, you— you don't intend to claim the money in the bank that you have stated to me is there, do you, as your own?' He said,

'That is exactly what I intend to do. Mrs. Grafmiller gave it to me before her death.' And I said to him, 'Well, she didn't give you anything in her will, did she?' And he didn't answer to that, and then he made some other remarks about the heirs in the case thinking there was a whole lot of money and they were going to get badly left, and there wasn't any money, and that if they wanted to see him he lived at such and such a place on Ninth Street, anytime they wanted to see him. I stated to him that was his privilege, if he wanted to claim that; that he would probably get in trouble. That was about the end of the conversation; he got up and left.

"Part Petitioner's Exhibit 1 written by Waterland:

" 'No cash belonging to the estate excepting that collected from rentals of property.'

"Q. What was stated at that time? A. Well, I again asked him for the inventory for the property of the estate so that I could prepare it—have the data to prepare the inventory, and he refused to give it to me, that is, he didn't give it to me; he had this statement, and at that time he showed me a bank-book, a cover of a bank-book—he wouldn't let me have the bank-book itself; he showed me the cover that time. Well, at that time I only saw the cover and I don't know whether it was the—it was the same book. It has the same number, because I wrote it down in my book at that time, 38364. He took the bank-book itself and kept the book and threw the cover over to me—and at that time I didn't see the bank-book itself, but I saw the cover, and written on it was '38364, Laura H. Grafmiller or Tyre H. Waterland'. Q. Now, when did you see Mr. Waterland again? A. Well, he also said at that time that he intended to resign, to get out. Well, I again advised him that I would have to have an inventory of the property so that—or the data, so that I could prepare an inventory of the property, and tried to get from him the—where the property was located, the description of the property, and all the property that she owned, personal and real estate, and after talking to him about that matter for sometime he said, well, that statement there was the only property she had, and I told him that it would be very hard for me to prepare an inventory from that; I would have to go to the records and see if I could find out the property she owned, and from other sources, and he again stated that he was going to get

out, he was tired of it, he had two or three other little things he wanted to do, and that as soon as they were done, he was going to get out. Well, I again asked him for the inventory of the property, and he talked the same as he did before, about a few lots up in North Sacramento or around different places, and these heirs could have them, they weren't worth anything anyway; he didn't care anything about them, and they could have them. Then he stated again that this little list of the property that he had given me on this paper was all that he could give me, and that he was going to resign, he was going to quit. I said, 'Well, when are you going to do that, Mr. Waterland?' He said, 'Right now'; he said, 'I have resigned right now'. And then Mr. Curtright asked him if he wanted us to prepare a resignation for him, and he said he did. Mr. Curtright went into the other room, sat down at the machine and prepared this resignation, and brought it in and handed it to Mr. Waterland, and Mr. Waterland read it and signed it, and said that—asked us at that time to appoint Mr. Stearns, and that Mr. Stearns was a good man, and to file a petition to appoint him, that he was a good man and he would make a good executor, and got up and walked out. Well, on numbers of times, that is, three or four different times after the will was made, he always had this bank-book in his pocket, and he would come in and sit down at the desk and talk about the estate, and at least three different times he showed me this bank-book, and I asked him if that was the amount of cash that Mrs. Grafmiller had, and he always made the statement to me, 'Oh, yes, that is Laura's money, that is the money in the bank'. And at the first time I saw this book there was something like—that is, approximately—nine thousand dollars in the bank, and the last time I saw it there was between seven and eight thousand. Now, subsequent to that last time that I saw this book, when he came into the office, he wouldn't let me see the book. I asked him several times when I was trying to find out whether there was any cash in the estate or not, to let me see the book; he always had the book in his inside pocket, but he would take the book out, out of the cover, and hold the book and throw the cover over to me—wouldn't let me see the book, and from that time on I never saw the book, but I did see the cover, on the date that I have already testified to, and wrote down the number of the book, and

what was on the back of the cover of the book. That is the envelope; I mean by the cover, the envelope enclosing the book. And he always spoke of the money in the estate as 'Laura's money'. I never at any time heard any claim by Mr. Waterland—As to his claiming any portion of this money, until the morning after the conversation in this courtroom on the twelfth of April, when I asked him if he intended to claim. Q. What did he say? A. He told me that he had an arrangement with Mrs. Grafmiller to draw out money out of the bank to pay the ordinary expenses of her illness, and her—the upkeep of her property, and so forth; that he was handling the entire estate, and that nobody else had any right to do anything with it, and that she wouldn't let anybody else handle the money but him, and that he had an arrangement whereby he could draw money sufficient to pay these debts as they would become due.

"Cross Examination: Q. All right, tell me. A. All right. When I discovered the fact that Mr. Waterland was going to claim some money that didn't—that I thought didn't belong to him, that belonged to the estate, then I told him that my duty, as far as his personal proposition was concerned, was at an end, that I wasn't representing him personally, but I was representing a man who was executor of the estate of Laura Grafmiller, and that, so far as I was concerned, that if he intended to do that, I didn't want to represent him any longer. Q. And Mrs. Grafmiller didn't tell you anything about the money that was on deposit in the Capital National Bank in the joint names of herself and Mr. Waterland? A. No, she didn't tell me it was deposited in the joint names, and she told me about her money and her property. Q. And— A. She told me the money that she had in the banks, and that it was her money, and that Mr. Waterland had an arrangement with her to pay the—approximately what money she had, and the property she had in different places—didn't give me any description—and stated that she had an arrangement with Mr. Waterland to pay the expenses, that he was attending to those things for her, and that the money was hers. She didn't tell me she had given any money to Mr. Waterland or intended to. Q. I will ask you if you ever asked Mr. Waterland to resign? A. I never did.

"Testimony of C. K. Curtright (attorney):

"The Court: What is the use? Mr. Johnson's testimony is as good as anybody's. Nobody is going to disprove him except to prove he was mistaken. The objection will be overruled. And your testimony would be the same as Mr. Johnson's? A. Yes, sir. The door was left ajar and I could hear the conversation, and the conversation Mr. Johnson testified to with regard to the resignation is substantially the conversation. He stated that he wished to resign. With Mr. Johnson, but overheard by me. Mr. Johnson came out and spoke to me—the door was still open; Mr. Waterland in the other room—'Can you prepare a resignation?' and I said 'Yes'. So I came through the door between the outer office and the inner office to get the form book from the shelf, which is near the door, and as I came in I stopped in the door and spoke to Mr. Waterland and said, 'Do I understand that you want us to prepare a resignation for you?' He said, 'Yes, that is correct'. So I took the form book off the shelf, took it into the next room, leaving the door open, typed up the resignation, leaving the signature line blank,—that was the only blank on the resignation,—took it in and laid it down almost in front of Mr. Waterland, and I had prepared a copy for him, and he signed the resignation in my presence without any request being made by anybody that he do so, and shoved the whole thing, the original, the copy, and the office copy across the desk to Mr. Johnson. And I went out. I said, 'You are Mr. Waterland, Mrs. Grafmiller's agent'. He said, 'Yes, I take care of all of her affairs out there'. And I am positive, and I remember this statement most distinctly; he said, 'Laura has plenty of money; Mrs. Grafmiller has lots of money; she doesn't have to worry about anything'. He said, 'I take care of all her affairs for her, and', he says, 'she has got it fixed down at the bank so I can go down there and, when anything is due, I can pay it'. He says, 'You know she is sick.' 'Yes', I said, 'I know that; and she can't get around'. And he says, 'Old George and Old Annie'—that is referring to Mrs. Grafmiller's sister and her husband,—'are always out there snooping around, but they won't get anything out of me. There is plenty of money down there; it is Laura's money, and I am going to take care of it. I am going to see she is taken care of; the rest of them don't do anything for her.'

"Testimony of Albert Stearns (Alternate Executor and Petitioner for Letters):

"A. Well, the most important, they had quite a talk over the signed papers, something like that—I didn't pay any attention, and there was something about some money in the bank, and referred to it in this way: Mr. Johnson says to him,—well, it was referred to as a joint account between Mr. —Mrs. Grafmiller and Mr. Waterland, and Mr. Johnson made the remark, something like this: 'You don't mean to say that you are going to claim that money?' 'Well, the bank says it is mine', he says; he says, 'I can draw every cent of it if I want to'. That was the conversation, exactly, or nearly, that way. Q. And I will ask you if you had any conversation with Mr. Waterland after Mrs. Grafmiller's death but prior to his appointment as executor? A. Yes. Q. And where? A. At my house, two or three times. Q. And what did Mr. Waterland tell you on that occasion about the administration of this estate? A. Well, I tried to —he told me that he was going to—he was going to get out. That is the conversation, mostly; and, of course, I was a— he was going to get out. I was a little on the alert to find out what property there was. I couldn't get very much information definitely as to what it was, and that was most of the conversation. On at least three different times he was at the house, or twice, anyway, prior to the time that he was appointed here. Q. How did you happen to be in the courtroom the day his petition came up? A. Why, Mr. Waterland told me it was coming up at a certain time, and that is the only way I had any notice of it; so I thought, 'Well, I better go down and see what is going on, maybe he might resign,' for he told me he was going to get out. I didn't know that he would. Q. Had he told you before you appeared that day in court that he would probably get out, or words to that effect? You state what he said. A. He made the remark at least twice that he was going to get out— Q. I see. A. —prior to that time. Q. He came to your house? A. Yes, he came to my house. Q. And the estate was discussed? A. Well, yes. I was trying to get a line on the property, if he was going to get out, and I couldn't get much out of it, only he said he was going to get out. Q. And you said you had been watching the estate because of the fact that Mr. Waterland told you he was going to get

out? A. That was the idea, and when Mr. Johnson told me he resigned, I supposed that was my duty as alternate, to apply. Q. Did he say anything about any animosity or difficulty with the heirs or the legatees? A. Well, yes, he said about some difficulty with the heirs. Q. Did he mention that to you? A. Yes, he did mention that to me, that there might be a disagreeable case, or something like that.''

It follows from the foregoing that the orders of the probate court should be, and they are hereby reversed, and the cause remanded for further proceedings in accordance with this opinion and the provisions of section 520 of the Probate Code relative to enforcing a settlement of his accounts by the respondent Waterland, and the appointment of his successor.

Pullen, P. J., and Thompson, J., concurred.